111 So.2d 588

**William Claud WRIGHT**

v.

**STATE.**

**8 Div. 784.**

Court of Appeals of Alabama.

March 18, 1958.

Rehearing Denied April 8, 1958.

Bradshaw, Barnett & Haltom and E. B. Haltom, Jr., Florence, for appellant.

John Patterson, Atty. Gen., Edmon L. Rinehart and Geo. Young, Asst. Attys. Gen., for the State.

CATES, Judge.

December 19, 1951, Wright and Francis Louis Berness were in an automobile going East from Florence, Alabama, on U. S. Highway 72. Near Tate's store, some fifteen miles from Florence, the car was seen to go across to its lefthand side of the paved portion of the highway and strike Miss Ella Wee Tays, who was walking East along the north shoulder of the road.

The judgment on first trial was reversed (38 Ala.App. 64, 79 So.2d 66; 262 Ala. 420, 79 So.2d 74). Thereafter, on November 7, 1955, the defendant was again brought to trial and this time found guilty of first degree manslaughter, with his punishment fixed at six years in the penitentiary. From judgment conforming to the jury's verdict, Wright is here on appeal from that judgment and a judgment overruling a motion for a new trial.

The facts for the State can be taken to be as outlined by Judge Harwood on former appeal in the fourth, fifth, ninth and tenth unnumbered paragraphs of his opinion (38 Ala.App. at pages 66 and 67, 79 So.2d at page 67):

> "The evidence presented by the State tended to show that Miss Tays, a crippled girl, was struck and instantly killed by an automobile which approached from the rear as she was walking along the shoulder of a highway in Lauderdale County. The automobile swerved from its proper side of the highway across the highway and onto the shoulder before striking Miss Tays.

> "The State's evidence further tended to show that the appellant was driving the automobile when it struck Miss Tays, and that he and his companion, Francis Louis Berness, who was the owner of the car, were drunk at the time. There was further evidence from which the jury could infer flight after the homicide.

> \* \* \* \* \* \*

> "The evidence presented by the appellant was directed toward showing that Berness rather than he was driving the car at the time Miss Tays was killed.

> "The appellant testified that he met Berness in Florence on the morning of the homicide, Miss Tays being killed at around 4:00 p. m. He and Berness visited various places in and around

Florence and drank beer and whiskey at frequent intervals. Berness bought a pint of whiskey to give to his father-in-law, and it was while going to deliver this that Miss Tays was hit. The appellant denied he was driving the car when Miss Tays was hit, and stated that if he was he was too drunk to remember."

Also, on re-trial, there was testimony by several witnesses that Wright said he was driving the car when the girl was hit, although he did not know at the time that he had struck her. This admission and the testimony of Miss Tays' niece (who was walking along the highway with her at the time of the collision) were sufficient to show Wright's agency in the homicide: the niece stated that immediately after hitting Miss Tays the car stopped a short distance up the road and Wright got out "from under the driver's wheel" staggering and came back toward the place where Miss Tays' body lay.

The undisputed evidence in this record is that Berness was in possession of the automobile at the beginning of the day and that Wright had no ownership in it at all.

Mr. Louis Fisher, an ATU investigator, testified for the State that after Wright and Berness were arrested he drove Wright with a deputy sheriff to the county seat. Proper predicate having been laid for the introduction of a voluntary confession, Fisher testified that on the way to the jail Wright stated, "Oh, if I hit that girl, I didn't know it," and went on to relate that he, Wright, was driving when they left town but that later on Berness drove.

As to what transpired at the scene after Miss Tays was hit, the State adduced the testimony of, among others, Grady Yancey, who saw the body lying in the ditch and Wright and Berness get out of the car and come back to where Miss Tays lay; Yancey was asked:

"Tell the Jury how Claud Wright left there? A. Well, they walked back down the road where this car was parked east, him and Berness, and they

walked down there and Claud got in on the left side and Berness went around to the right and got in on the right."

However, when the car was finally overtaken Berness was the driver.

When Wright took the stand in his own defense, he testified that he did not remember driving the vehicle at all.

This aspect of the variations in the testimony as to who was driving is brought out to illustrate the background of the trial judge's rather lengthy charge which correctly states the law as to the criminal responsibility of an aider or abettor where, in the course of carrying out a joint venture, one of the parties commits another crime—or that of principal and accessory. Defense counsel took exceptions to many parts of the court's oral charge and argued that under the evidence this phase of the oral charge was tantamount to instructing the jury that they might determine guilt by association, assuming that Berness and not Wright was the driver of the vehicle.

We bring out Fisher's testimony to illustrate that the jury could have viewed the evidence under Wright's theory that he was not driving: yet, also, if Wright was driving and later surrendered the control of the car back to Berness before the collision, the surrender of custody could have been sufficient to support the verdict in imposing criminal liability upon Wright even though Berness were the driver who hit Miss Tays; the evidence of Berness' being intoxicated was sufficient to have made Wright's apparent voluntary surrender of the vehicle to Berness, coupled with his failure to get out of the car, an act showing a reckless disregard of human life, from which the jury could have imputed to Wright responsibility commensurate with voluntary manslaughter.

Wright tendered a number of requested written charges which were refused by the trial judge, of which No. 8 and No. 53 were typical. These two charges read as follows:

"(8) I charge you, gentlemen of the jury, that if after you have carefully considered all the evidence in this case you have a reasonable doubt in your minds as to whether the defendant, William Claud Wright, was driving the alleged car at the time and place in question, you must acquit the defendant, William Claud Wright."

"(53) The Court charges the jury, that if you believe from all the evidence in this case that Francis Louis Berness was driving the automobile at the time it allegedly struck Ella Wee Tayes, then you must find the Defendant, Claud Wright, not guilty."

■ Ordinarily, a drunken passenger, who has no power (reserved or asserted) to direct or control the operation of a car by another, is not criminally responsible for the acts of the driver. See State v. Trott, 190 N.C. 674, 130 S.E. 627, 42 A.L.R. 1114. If sodden enough he is but an animate cargo: if articulate, no more than a supercargo whom the driver is under a duty not to obey.

The evidence here was that Berness alone wished to take his father-in-law who lived east of Florence a pint of whiskey. Transporting a pint of whiskey in a dry county (State store or wildcat) is only a misdemeanor flowing from possession, either moving or stationary. Code 1940, T. 29, § 98. Had there been a combining to give the whiskey to Berness' father-in-law (also denounced by § 98), then the journey certainly would have been in furtherance of this purpose.

The theory of joint culpability for the same crime is qualified:

"The more flagrant and vicious the act agreed to be done, the wider is the latitude of the agency impliedly conferred to execute it." Williams v. State, 81 Ala. 1, 1 So. 179, 182.

The lack of evidence (except (1) of the whiskey being in Berness' car, (2) of the two men getting drunk together, and (3) of their swapping the steering wheel) as to a community of design between them was adequately raised by the refusal of charges 8 and 53, above.

The only evidence that impresses the writer as being substantial enough to tag Wright with responsibility for voluntary manslaughter if Berness were driving was Wright's admission that he had been driving when they left Florence. If he drove then, but let Berness have the car before the collision, the jury could have viewed this abandonment of the car to Berness as an act sufficiently culpable to make Wright a principal in the second degree by reason of having placed a quasi-dangerous instrumentality at the disposal of his drunken companion.

■■ Under the evidence there was no error in denying charges 8 and 53; nor was there error in many of the other references of the trial judge to the law of joint responsibility, these being correct statements of the law as such; and had the defendant wished a further extension of the charge, it would have been his duty to have presented written instructions extending the instructions rather than merely to take an exception. Wilson v. State, 219 Ala. 364, 122 So. 617; Patterson v. State, 37 Ala.App. 161, 66 So.2d 191.

■ The solicitor argued to the jury, over objection, that it made no difference who was driving as between Wright or Berness—"They conspired to take this whiskey down the highway to Mr. Jesse Putnam, the father-in-law of Berness." While it may be doubtful that the crime of manslaughter can be the object of a conspiracy, since malice aforethought is not an ingredient, nevertheless using the words "conspire" and "conspiracy," (as was done in this trial, where the indictment being for a felony, conspiracy in and of itself merged into the higher crime) with respect to the charge of felony was but another way of expressing the joint and several responsibility of principals in both degrees. We think Williams v. State, supra, uses the word "conspiracy" in this broad sense. See Smith v. State, 8 Ala.App. 187, 62 So. 575.

■ The defendant requested charge 17, which was given by the court and which reads as follows:

"17. I charge you, gentlemen of the jury, that if you are reasonably satisfied from the evidence in this case that the automobile in question was at the time and place alleged being driven by Francis Berness, and if you are further reasonably satisfied from all the evidence in the case that the defendant, William Claud Wright, had no control or right of control over the car in question at the time and place alleged, then I further charge you that you must acquit the defendant, William Claud Wright."

Wright claims that this was in conflict with that portion of the court's oral charge, which reads as follows:

"If you are satisfied from the evidence beyond a reasonable doubt that Mr. Wright was not driving but that his companion, Mr. Berness, was driving, and that he was there aiding and abetting him, as I have defined aiding and abetting to you, and that the two had conspired to do some unlawful act, and that the killing of Miss Tays was the direct and proximate consequence of such act, then the defendant would be guilty of murder in the second degree or manslaughter in the first degree or manslaughter in the second degree."

It is our view that there is no such conflict and that there is evidence to support the verdict on the ground that, though Berness may have been driving when Miss Tays was struck, Wright in one statement admitted he had been in control of the car before Berness drove. Moreover, we have above treated the theory under one phase of the evidence that Wright could be held negligent if he let Berness drive.

■ In rebuttal, the prosecution introduced a witness, Mr. Will Killen, who was asked if Wright came by his store on the day of the collision and asked Mr. Killen to call an ambulance. This question was ob-

jected to on the theory that it was an impeachment on an immaterial matter.

On cross-examination, Wright had testified as follows:

"Q. You do remember a boy you thought was Dean stopping you and telling you that you had better go back? A. No, we was stopped and I was going in Mr. Killen's store there and ask for him to call an ambulance, that a little girl got killed.

"Q. You stopped at Killen's Store at Cross Roads? A. Yes, sir.

"Q. At Elgin Cross Roads? A. Yes, sir.

"Q. And you went in there and asked Mr. W. S. Killen to call an ambulance? A. Yes, that a little girl had got killed."

We view the introduction of the narration of stopping at the store and his saying, "Yes, that a little girl had got killed," as a voluntary statement by Wright, since it was not responsive to the question put him by the solicitor; therefore, it partakes of the nature of testimony in chief.

■ The defendant argues that he was injured by the trial court's refusal to give the written requested charge hypothesized on the evidence that they could not find Wright guilty of murder in the second degree. Since the jury's verdict, in effect, acquitted him of murder in the second degree, any error in the refusal of the charge is now moot.

The defendant, however, says that, under the reasoning of Mitchell v. State, 60 Ala. 26, the trial court is always under the duty to charge out a higher included crime where the undisputed evidence will not support that aspect of the indictment. Wright argues that it is the standing practice and procedure of petit juries to cut their findings of guilt to an included offense less than the maximum crime charged when the evidence is weak and they still want to convict for something.

Under the authorities relating to death caused by the driving of an automobile while intoxicated, our view of the evidence here is that it would have been sufficient to have supported a verdict of second degree murder. Moreover, it would be anarchistic of us to say that there is any standing practice or procedure of petit juries to trim the verdict if the evidence is weak.

█ Our view that there was sufficient evidence which could have supported a verdict of second degree murder also answers the defendant's complaint that the judge should have charged out the offense of voluntary manslaughter: also of the claim of error in the trial judge's overruling Wright's motion at the close of the State's case to exclude the evidence on the ground that it was not sufficient to prove the offense of murder in the second degree, and a similar motion based on a supposed failure to establish a prima facie case of first degree manslaughter.

The defendant took a number of exceptions to the court's oral charge as to the ingredients of murder in the second degree and manslaughter in the first degree. Admittedly, it is a difficult task to give a distinction between murder and manslaughter, except by the negative means of first defining common-law murder and then removing the ingredient of malice therefrom. Likewise, a further difficulty occurs when one tries to start with involuntary manslaughter, particularly that arising out of negligence, and proceed thence to a definition of voluntary manslaughter, as in the case of homicide by driving an automobile.

Viewing the oral charge as an entirety and in the light of the evidence, we find it unexceptionable.

█ Wright alleges that one of the jurors, James Edderd Canerday, was related within the ninth degree of consanguinity to Linda Hamm, the niece of the deceased, and also he was related in the same degree to the aunt of the deceased. This relationship was not brought out on voir dire, since apparently Canerday was not aware of it. This point was first raised on motion for new trial. Code 1940, T. 30, § 55, as amended, reads in part:

"It is good ground for challenge by either party:

\* \* \* \* \* \*

"4. That he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree (computing according to the rules of the civil law), either with the defendant or with the prosecutor, or the person alleged to be injured."

*First,* we hold that Linda Hamm was not the "prosecutor" within the meaning of the statute. Ordinarily, we can accept the Georgia definition—"One who instigates prosecution by making an affidavit charging a named person with the commission of a penal offense, on which a warrant is issued, or an indictment or accusation is based, is a prosecutor (citing authorities)." Ethridge v. State, 164 Ga. 53, 137 S.E. 784, 785. The Ethridge case involved the consanguinity of a juror with the sheriff.

█ The complaining affidavit against Wright was signed "J. J. Rose." The back of the indictment is endorsed "no prosecutor." We consider that this endorsement and Rose's making the originating complaint create a rebuttable presumption that Linda Hamm was not the prosecutor. See also King v. Second Nat. Bank & Tr. Co., 234 Ala. 106, 173 So. 498.

█ *Second,* we consider the State adduced proof which, if believed, refuted the movant's claim that Ella Wee Tays was kin to Canerday within the degree of disqualification. We turn to Reece v. State, 208 Ga. 690, 69 S.E.2d 92, 93:

"When, as in this case, an extraordinary motion for new trial is made on the ground that the verdict is illegal and void because one of the jurors rendering it was disqualified and incompetent to serve because he was related to the prosecutor within the degree of relationship prohibited by Code, § 59-716,

**270**

and on the hearing affidavits are introduced by the movant tending to establish the sufficiency of that ground, and, on a counter-showing made by the State, evidence is introduced to the effect that no such relationship existed, the judge passing on the motion becomes and is the exclusive trior of the fact in controversy, and this court will not interfere with his decision on that issue when there is any evidence to support his finding. * * *"

■ Concerning allegedly biased jurors, Hawkins v. State, 29 Ala.App. 221, 195 So. 762, followed the same principle of not disturbing the trial judge's decision where the evidence is ambivalent and the opposing witnesses are, on the appellate record, equally credible. 23 C.J.S. Criminal Law § 1496 b. Hence, we consider the ruling of the trial judge on the motion for a new trial should not be disturbed.

We have considered this record in its entirety and are at the conclusion that the defendant has had a fair trial and that the judgment appealed from is due to be affirmed.

Affirmed.

HARWOOD, Presiding Judge (concurring specially).

I concur in the conclusions reached by Judge CATES.

However, it is the opinion of this writer that, while there may be a conflict as to whether Wright or Berness was the actual driver at the time Miss Tays was struck, the evidence shows that this pair got together early on the day of the collision, were together constantly, provided themselves with liquor, and up until the time of the collision were drinking together and were driving together over the countryside.

There was some evidence tending to show a swapping of control of the car during their drives, first one driving and then the other. Their actions were mutually acceptable, and they acted jointly.

Their driving while under the influence of intoxicating beverages was unlawful. In this they were acting with a joint purpose.

To prove this, it was not necessary to show an express agreement or understanding between them, but such joint action may be inferred from their conduct, and the circumstances. See State v. Sarver, 134 Kan. 98, 4 P.2d 440.

Under the evidence the jury was fully warranted in finding joint action between the appellant and Berness for several hours prior to the collision.

A part of this joint and concert action was illegal, and led proximately to the collision.

In this light, the action of the court in the refusal of charges 8 and 53, and its instructions as to joint responsibility, and the court's refusal to exclude the solicitor's argument were all without error.

Certainly it cannot be said that the joint conduct of Wright and Berness was not of a character but that the tragic results of their conduct would imply a felonious intent.

On Application for Rehearing

CATES, Judge.

Wright has applied for a rehearing asking us to reconsider mainly (1) our view of the joint criminal responsibility of Berness and Wright; and (2) that it was error not to have condemned the trial court's use (on page 593 of 111 So.2d) of: "If you are satisfied * * * *beyond a reasonable doubt* that Mr. Wright was not driving * * *." (Italics supplied.)

As to the latter, we consider any error from the statement of the burden of the proof therein (to which Wright duly excepted) was cured by the giving of Wright's requested charge 17 and by the remainder of the oral charge fairly read with the given charges.

Regarding the joint responsibility or conspiracy phase of the opinions, we might point out that our discussion of it might well be treated as a "fringe benefit" for the defendant, inasmuch as there were tendencies in the evidence from which the jury could have concluded, under the required rule, that Wright was the actual driver of the car.

Application overruled.